# 24-1237-cv

## United States Court of Appeals
### *for the*
## Second Circuit

MINISTER LOUIS FARRAKHAN, NATION OF ISLAM,

*Plaintiffs-Appellants,*

– v. –

ANTI-DEFAMATION LEAGUE, JOHNATHAN GREENBLATT, individually, in his official capacity as CEO and national director of the Anti-Defamation League, RABBI ABRAHAM COOPER, individually and in his official capacity as Director of Social Global Action Agenda for Simon Wiesenthal Center, SIMON WIESENTHAL CENTER,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

ABDUL A. MUHAMMAD
OFFICE OF THE GENERAL COUNSEL
7351 South Stony Island Avenue
Chicago, Illinois 60649
(215) 313-0738

SA'AD A. MUHAMMAD
POWER AND DIXON, PC
1525 East 53rd Street, Suite 447
Chicago, Illinois 60615
(312) 263-5989

MICHAEL K. MUHAMMAD
MUHAMMAD LAW FIRM
10440 North Central Expressway
Suite 800
Dallas, Texas 75231
(214) 432- 6285

*Attorneys for Plaintiffs-Appellants*

 COUNSEL PRESS    (800) 4-APPEAL • (624128)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant, The Nation of Islam, for corporate and legal purposes, is registered as Muhammad's Holy Temple of Islam, Inc., under the not-for-profit corporation laws of the State of Illinois. It has no stock and has no parent corporation.

**Table of Contents**

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION .............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................3

    Issue 1: Morgan State Injury ......................................................................3

    Issue 2: Minister Louis Farrakhan Injury Regarding White House Strategy ........3

    Issue 3: Injury - Vimeo ..............................................................................3

    Issue 4:  N.O.I. Reputational Harm – New York ..........................................4

    Issue 5: ADL Chilling Effect of Association ...............................................4

    Issue 6: N.O.I. §1983 Standing on Behalf of Members ................................4

    Issue 7: Actual Malice ...............................................................................4

    Issue 8: The ADL as a Quasi-governmental Actor ......................................4

    Issue 9: Injunctive Relief ...........................................................................5

    Issue 10: 5th Category of Defamation *Per Se* ...........................................5

STATEMENT OF THE CASE ............................................................................5

SUMMARY OF ARGUMENT ...........................................................................6

STANDARD OF REVIEW .................................................................................6

ARGUMENT ......................................................................................................7

    Standing Analysis ......................................................................................7

    Issue 1 – The SAC sufficiently pled that Minister Farrakhan's injury from Morgan State's denial of the use of its venue was "fairly traceable" to the ADL. ..............8

    Issue 2 – The SAC sufficiently pled an injury-in-fact that is concrete and particularized to Minister Farrakhan when it alleged that the ADL implemented its policies on antisemitism through the White House and such action poses an imminent threat to Minister Farrakhan's right to free exercise of his religion. ...11

    Issue 3 – The SAC sufficiently pled facts to demonstrate that its injury-in-fact was fairly traceable to the ADL. ...................................................................15

Issue 4 – The SAC sufficiently pled injuries to the N.O.I. and its members for violation of their free exercise of religion resulting in reputational harm and a chilling effect on its religious activities within both the City and State of New York as a result of the threat of sanctions by both City and State officals....................17

Issue 5 – The SAC sufficiently alleged facts to establish that the ADL's surveillance and false labeling infringes upon the N.O.I. and its members' right to freedom of association resulting in, among other things, impairment of reputation. ......................................................................................................................22

Issue 6 – The N.O.I. sufficiently pled facts in Counts 4 and 5 of the SAC to establish its standing for itself and on behalf of its members to bring claims against the ADL pursuant to 42 U.S.C §1983..................................................................24

Issue 7 – The SAC sufficiently pled facts to state claims for defamation. ..........30

  A.  The SAC adequately pled a claim for defamation with regard to the ADL and Mr. Greenblatt falsely alleging that Minister Farrakhan referred "to Jews 'as Termites'" ....................................................................................................31

  B.  The SAC adequately pled a claim for defamation with regard to the ADL and Mr. Greenblatt's mischaracterization of Minister Farrakhan's use of the phrase "Satanic Jews." ...........................................................................................34

  C.    The SAC adequately pled a claim for defamation with regard to the ADL and Mr. Greenblatt falsely labeling Minister Farrakhan as an "anti-Semite."..................................................................................................................36

  D.  The SAC adequately pled a claim for defamation with regard to the ADL falsely claiming that Minister "Farrakhan Predicts Another Holocaust." ........40

  E.  The SAC adequately pled a claim for defamation with regard to the SWC falsely claiming that Minister Farrakhan used the phrase "Synagogue of Satan" to "Demonize Judaism." ...................................................................................42

  F.  The SAC adequately pled a claim for defamation with regard to the SWC and Mr. Cooper's false claim that Minister Farrakhan committed a crime of "anti-Semitic incitement."..................................................................................43

Issue 8 – The SAC sufficiently pled the ADL is a quasi-governmental actor capable of infringing upon the Plaintiffs' First Amendment rights. ..................................45

Issue 9 - The district court abused its discretion in failing to grant Plaintiffs' request for injunctive relief. .............................................................49

Issue 10 - The SAC sufficiently pled facts which warranted the determination of the false use of the phrase "Anti-Semite" and its derivatives to be the 5th category of defamation *per se*. ...........................................................52

CONCLUSION .......................................................................54

CERTIFICATE OF COMPLIANCE.......................................................55

# TABLE OF AUTHORITIES

## Constitutional Provisions

U.S. Const. amend. I ....................... 2, 4, 9, 11, 12, 16, 21, 24, 27, 45, 46, 47, 49, 50

## Federal Statutes

28 U.S.C. § 1291 ...................................................................................3

28 U.S.C. §1331 ....................................................................................2

28 U.S.C. §1332 ....................................................................................2

28 U.S.C. §1367 ....................................................................................2

28 U.S.C. §2201 ....................................................................................2

28 U.S.C. §2201(a) ..............................................................................46

28 U.S.C. §2202 ....................................................................................2

42 U.S.C. §1983 ................................... 1, 2, 4, 5, 18, 23, 24, 25, 26, 27, 28

## Federal Rules

12(b)(1) .......................................................................3, 5, 6, 9, 11, 23, 35

12(b)(6) ................................................................................. 3, 5, 32

## United States Supreme Court Cases

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ........................................................................14

*Bates v. City of Little Rock*,
  361 U.S. 516, 523 (1960) ...............................................................29

*Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*,
  448 F.3d 138 (2d Cir. 2006).............................................................26

*Dept. of Commerce v. New York*,
588 U.S. 752 (2019) ...............................................................................8

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006). ...........................................................................49

*Elrod v. Burns*,
427 U.S. 347 (1976) .............................................................................12

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .............................................................................25

*Healy v. James*,
408 U.S. 169 (1972) .............................................................................10

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .............................................................................26

*Larson v. Valente*,
456 U.S. 228 (1982). ..............................................................................7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................................................................. 7, 8, 30

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991) .............................................................................33

*Mass v. EPA*,
549 U.S. 497 (2007) ..............................................................................7

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) .................................................................................36

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958), .................................................................. 26, 28, 29

*National Motor Freight Assn. v. United States*,
372 U.S. 246 (1963) .............................................................................26

*Spokeo Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................11

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...........................................................................7

*Steffel v. Thompson,*
    415 U. S. 452 (1974) .......................................................................17

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................... 17, 20

*Virginia v. American Booksellers Ass'n,*
    484 U.S. 383 (1988) ................................................................... 20, 21

*Warth v. Seldin,*
    422 U.S. 490 (1975). ......................................................................26

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995) ........................................................................45

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................49

**Federal Cases**

*Admiral Ins. Co. v. Niagara,*
    57 F.4th 85 (2d Cir. 2023) ........................................................ 6, 49, 53

*Bohnak v. Marsh & McLennan Cos.,*
    79 F.4th 276 (2d Cir. 2022) ............................................................12

*Carter v. HealthPort Techs., LLC,*
    822 F.3d 47 (2d Cir. 2016) ............................................................6, 8

*Celle v. Filipino Reporter Enters. Inc.,*
    209 F.3d 163 (2d Cir. 2000) ...........................................................31

*Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
 868 F.3d 104 (2d Cir. 2017)......................................................25

*Egazarian v. Zalmayev*,
 880 F.Supp. 494 (S.D.N.Y. 2012) ...........................................38

*Elias v. Rolling Stone LLC*,
 872 F.3d 97 (2d Cir. 2017) ......................................................31

*Denney v. Deutsche Bank AG*,
 443 F.3d 253 (2d Cir. 2006)....................................................11

*Irish Lesbian & Gay Org. v. Giuliani*,
 143 F.3d 638 (2d Cir.1998).....................................................24

*John v. Whole Foods Mkt. Grp. Inc.*,
 858 F.3d 732 (2d Cir. 2017)............................................... 21, 22

*Jusino v. Fed'n of Cath. Teachers, Inc.*,
 54 F.4th 95 (2d Cir. 2022)........................................................6

*LC v. UBS Securities, LLC*,
 711 F.3d 322 (2d Cir. 2013)....................................................11

*Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*,
 667 F.2d 267 (2d Cir. 1981)....................................................27

*McMorris v. Carlos Lopez*,
 995 F.3d 295 (2d Cir. 2021) ...................................................17

*MedImmune, Inc. v. Genentech, Inc.*,
 549 U. S. 118 (2007)........................................................ 20, 46

*Moya v. U.S. Dep't of Homeland Sec.*,
 975 F.3d 120 (2d Cir. 2020)....................................................25

*Mullemeister v. Snap-On Tools Corp.*,
 587 F. Supp. 868 (SDNY 1984) ..............................................53

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011) ............................................................ 24, 25, 29, 30

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014) ................................................... 39

*Ross v. Bank of Am., N.A.*,
    524 F.3d 217 (2d Cir. 2008) ................................................................ 11

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) .................................................................. 9

*Soule v. Conn. Ass'n of Sch., Inc.*,
    90 F. 4th 34 (2d Cir. 2023) ................................................................. 7

*United States v. Wilkerson*,
    361 F.3d (2d Cir. 2004) ...................................................................... 30

*Yang v. Shanghai Cafe Inc.*,
    No. 10 Civ. 8372, 2012 WL 398641 (S.D.N.Y. Feb. 8, 2012) ........... 38

**New York State Cases**

*Mencher v. Chesley*,
    297 N.Y. 94 (1947) ............................................................................. 53

**INTRODUCTION**

This action arises under the First and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §1983, and the Declaratory Judgment Act. This action also arises under the defamation laws of the State of New York.

With respect to the constitutional violations, Plaintiff-Appellant (hereinafter, "Plaintiff") Minister Louis Farrakhan (hereinafter, "Minister Farrakhan) claimed that Defendant-Appellee (hereinafter, "Defendant") Anti-Defamation League (hereinafter, "ADL"), as a quasi-governmental actor, violated his right to freedom of association when it, upon information and belief, coerced Morgan State University (hereinafter, "Morgan State") to deny an application for him to speak, acting in conformity with its written policy to "impose an obligation on those who deal with him, or, as in the case of universities, give him a platform." In addition, Minister Farrakhan claimed the ADL, as a quasi-governmental actor, posed an imminent threat to the free exercise of his religion based upon its recent efforts to interfere with his ability to speak in a public arena. Plaintiff-Appellant (hereinafter, "Plaintiff") Nation of Islam (hereinafter, "N.O.I.") claimed that the ADL violated its free exercise of religion when it caused Vimeo to cancel its streaming account.

The N.O.I. claimed the ADL posed an imminent threat to the free exercise of its freedom of religion and freedom of association in violation of 42 U.S.C. §1983, when both the governor of New York and the mayor of New York City publicly

1

acknowledged their partnership with the ADL to utilize law enforcement to arrest, "eliminate," and eradicate the "feeders of anti-semitism," for which the ADL erroneously determined Minister Farrakhan and the N.O.I. to be.

Additionally, Minister Farrakhan claimed that all Defendants, including Simon Weisenthal Center (hereinafter, "SWC") and Rabbi Abraham Cooper (hereinafter, "Mr. Cooper"), defamed him with various published statements. With respect to the Declaratory Judgment requests, Plaintiffs sought to have the false use of the word "anti-Semite," and its deratives, to be declared to be the fifth category of defamation *per se* and Plaintiffs sought to have the ADL declared to be a quasi-governmental actor.

Lastly, Plaintiffs sought to have the Defendants enjoined from attempting to infringe upon the free exercise of their First Amendment rights in the future.

## JURISDICTIONAL STATEMENT

On January 5, 2024, Minister Farrakhan and the N.O.I. (hereinafter, "Plaintiffs") filed a Second Amended Complaint (hereinafter, "SAC") raising claims under the First Amendment of the U.S. Constitution and 42 U.S.C. §1983.

The district court had subject matter jurisdiction pursuant to: 1) 28 U.S.C. §1331, 2) 42 U.S.C. §1983, 3) 28 U.S.C. §1332, 4) 28 U.S.C. §2201 and §2202, and 5) supplemental jurisdiction pursuant to 28 U.S.C. §1367. The district court granted

Defendants ADL and Jonathan Greenblatt's (hereinafter, "Mr. Greenblatt"), motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and it granted all the Defendants' motions to dismiss the defamation and declaratory judgment claims pursuant to 12(b)(6). The district court entered judgment on April 5, 2024, and Plaintiffs timely filed a Notice of Appeal on May 3, 2024. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**Issue 1: Morgan State Injury**

Whether Count 1 of the SAC sufficiently pled that Minister Farrakhan's injury from Morgan State's denial of the use of its venue was "fairly traceable" to the ADL?

**Issue 2: Minister Louis Farrakhan Injury Regarding White House Strategy**

Whether Count 2 of the SAC sufficiently pled an injury-in-fact that is concrete and particularized when it alleged that the ADL implemented its policies on antisemitism through the White House which poses a real and imminent threat to Minister Farrakhan's free exercise of his religion?

**Issue 3: Injury - Vimeo**

Whether Count 3 of the SAC sufficiently pled facts to demonstrate that its injury-in-fact was fairly traceable to the ADL?

3

**Issue 4:  N.O.I. Reputational Harm – New York**

Whether Count 4 of the SAC sufficiently pled injuries to the N.O.I. and its members for violation of their free exercise of religion rights resulting in reputational harm, threat of sanctions by the City and State of New York, and for a chilling effect on its religious activities?

**Issue 5: ADL Chilling Effect of Association**

Whether Count 5 of the SAC sufficiently pled facts to establish that the actions of ADL would likely cause the disassociation of N.O.I. members due to impairment of reputation, a chilling effect of association with non-members and the chilling effect of being targets of the ADL's unlawful surveillance?

**Issue 6: N.O.I. §1983 Standing on Behalf of Members**

Whether the N.O.I. sufficiently pled facts to establish standing on behalf of itself and its members under 42 U.S.C §1983?

**Issue 7: Actual Malice**

Whether Counts 6-9 sufficiently pled facts to state claims for defamation upon which relief could be granted?

**Issue 8: The ADL as a Quasi-governmental Actor**

Whether Count 11 of the SAC sufficiently pled that the ADL is a quasi-governmental actor capable of infringing upon the Plaintiffs' First Amendment rights?

4

**Issue 9: Injunctive Relief**

Whether the district court abused its discretion in failing to grant Plaintiffs' requests for injunctive relief?

**Issue 10: 5th Category of Defamation *Per Se***

Whether the false use of the phrase "anti-Semite," and it derivatives, should be declared the 5th category of defamation *per se*?

## STATEMENT OF THE CASE

The district court granted Defendants' Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), declined to enter injunctive relief, and declined to exercise its jurisdiction pursuant to the Declaratory Judgment Act. The district court concluded that two of Plaintiffs' Constitutional injuries were not traceable to the ADL, and that one constitutional claim failed to allege an injury.

The lower court also concluded that the 42 U.S.C. §1983 claims were not cognizable because the pled injuries were alleged to be speculative.

The district court concluded that the SAC did not plead actual malice and that the Defendants-Appellees' defamatory statements were non-actionable opinion. The district court also declined to exercise jurisdiction under the Declaratory Judgment Act to resolve certain issues between the parties.

## SUMMARY OF ARGUMENT

Plaintiffs argue on appeal that this Court should reverse the district court's granting of Defendants' Motion to Dismiss pursuant to 12(b)(1) and (6) because Plaintiffs do have standing to bring the claims alleged in the SAC and Minister Farrakhan did sufficiently state claims upon which relief could be granted.

## STANDARD OF REVIEW

The standard of review for the district court's dismissals pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6) "is *de novo*, construing the complaint liberally and accepting all factual allegations in the complaint as true. All well-pleaded allegations are accepted as true, and they are interpreted favorably to the Plaintiffs." *Jusino v. Fed'n of Cath. Teachers, Inc.*, 54 F.4ᵗʰ 95, 100 (2d Cir. 2022); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## **ARGUMENT**

**Standing Analysis**

To establish standing, a plaintiff must allege: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent, (2) there is a "causal connection between the injury and the conduct complained of," and (3) it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(internal quotation marks omitted).

"To satisfy the redressability element of Article III standing, a plaintiff must show that it is 'likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision." *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F. 4th 34, 47 (2d Cir. 2023)(en banc)(citations omitted). However, a plaintiff "need not show that a favorable decision will relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 (1982). A remedy that "would serve to . . . eliminate any effects of" the alleged violation that produced the injury is sufficient. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105-06 (1998).

The Supreme Court held in *Mass. v. EPA* that a remedy that "will not by itself reverse" the alleged injury would still satisfy the redressability requirement if it "reduced [that injury] to some extent." 549 U.S. 497, 525-26 (2007). In *Carter*, this Circuit held, "[w]hen the Rule 12(b)(1) motion is facial, i.e., based solely on the

7

allegations of the complaint or the complaint and exhibits attached to it, the plaintiff has no evidentiary burden." 882 F.3d 47, 56. The task of the district court is to determine whether the pleading "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id*.

The Supreme Court has held, "general factual allegations of injury...may suffice" to support standing because it presumes that "general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561.

**Issue 1 – The SAC sufficiently pled that Minister Farrakhan's injury from Morgan State's denial of the use of its venue was "fairly traceable" to the ADL.**

A plaintiff must show that the injury alleged is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court[.]" *Lujan*, 504 U.S. at 560. That requirement "does not create an onerous standard." *Carter,* 822 F.3d at 55. "It requires no more than *de facto* causality." *Dept. of Commerce v. New York*, 588 U.S. 752, 768 (2019). "Traceability is satisfied" when plaintiffs established that the third-party action leading to the alleged harm was "likely attributable at least in part" to the challenged action. *Id*. A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing. *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).

8

In the case at bar, Minister Farrakhan alleged in Count 1 of the SAC that the ADL's "close nexus" and "entwinement" with the federal government rendered it a quasi-governmental entity capable of infringing upon his First Amendment rights. (A-70-75, ¶¶241-70). The SAC went on to allege facts to support the claim that the ADL, upon information and belief, caused Morgan State to ultimately deny the application to use its facility to speak.

Specifically, the SAC stated, in part, that said denial of the application that would have allowed Minister Farrakhan to speak on its campus, and subsequent infringement of his First Amendment rights, was a direct result of ADL effectuating its written policy of "impos[ing] an obligation on those who deal with him, or, as in the case of universities, give him a platform." (A-78¶¶, 290-92).

The SAC went on to note that the ADL "either put pressure on the administration, or threatened to lobby against funding for Morgan State, if the administration allowed Minister Farrakhan to associate and peaceably assemble" with its students. (A-76, ¶276). The SAC then alleged that said actions infringed upon Minister Farrakhan's First Amendment right to freedom of association and free exercise of his religion. (A-83, ¶321).

The district court, in granting the ADL's 12(b)(1) motion held that "[t]he SAC fails to plead that the plaintiffs' injury from MSU's 2023 refusal of its forum is fairly traceable to the ADL." (SPA-12). The allegations contained in the SAC, however,

9

did allege "*de facto* causality" between the alleged actions by the ADL and Morgan State's denial of the application to host a speaking event on its campus.

Those specific factual allegations were not predicated on "the ADL's years of advocacy" as stated by the district court in response to Minister Farrakhan's alternative allegations (SPA-12), but the factual allegations were predicated upon his primary allegations which specifically alleged actions by the ADL toward and against Morgan State in 2023, which caused it to reject the application that would have allowed him to speak on its campus.

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972). "The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Id*. This rule of law underscores the necessity of safeguarding free speech and religious expression against undue influence or suppression.

Since a plaintiff's burden at the pleading stage "is not onerous," and since "all well-pleaded allegations are accepted as true, and they are interpreted favorably to the Plaintiffs," then Minister Farrakhan respectfully requests this Circuit find that he has standing to bring a First Amendment violation claim against the ADL because

the allegaions as stated in the SAC meet the burden of establishing the infringing actions of Morgan State were "fairly traceable" to the ADL.

**Issue 2 – The SAC sufficiently pled an injury-in-fact that is concrete and particularized to Minister Farrakhan when it alleged that the ADL implemented its policies on antisemitism through the White House and such action poses an imminent threat to Minister Farrakhan's right to free exercise of his religion.**

The 2nd Circuit has repeatedly described the pleading necessary to establish injury-in-fact as "a low threshold." *WC Capital Mgmt., LLC v. UBS Securities, LLC* 711 F.3d 322, 329 (2d Cir. 2013), quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir. 2008). To establish injury in fact, a plaintiff need only show that he or she suffered an invasion of a legally protected interest that is concrete and particularized. *Spokeo Inc. v. Robins,* 578 U.S. 330, 339 (2016). However, "an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law. An injury-in-fact may simply be the fear or anxiety of future harm." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).

"For an injury to be particularized, it must affect the plaintiff in a personal and individual way," and an injury is concrete if it is "real[] and not abstract," although an injury need not be tangible to be concrete. *Id.* at 340.

"Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a

basis for lawsuits in American courts. Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *Bohnak v. Marsh & McLennan Cos*. 79 F.4th 276, 284 (2d Cir. 2022). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

At bar, the district court, in its ruling, held that, "Claim 2 fails to plead an injury in fact that is concrete and particularized [,]" and that it failed to "allege [the] threat of prosecution of Farrakhan is 'actual or imminent, as opposed to conjectural or hypothetical.'"(Citations omitted)(SPA-13). The SAC, however, did plead concrete and particularized injury-in-fact that could be characterized as "imminent."

Specifically, the SAC alleged that the ADL developed its own plan to combat who and what it determines to be anti-Semitic and then used its "close nexus" to, and "entwinement" with, the federal government to cause it to be implemented through the Executive Branch. (A-70-74, ¶¶ 241-67).

The SAC cited evidence to support said allegations by citing to the ADL's own website wherein it took credit for the adoption of said National Strategy and how it mirrored, almost verbatim, the plan it developed prior to the establishment of the National Strategy. (A-73, ¶¶260-61). The SAC also pled that the ADL has labeled Minister Farrakhan as "a leading promoter of antisemitism in America today." (A-116, ¶510).

The coupling of these actions by the ADL produced a reasonable "anxiety of future harm[]," hence, the filing of the lawsuit against the ADL, and thereby constitutes a cognizable and actionable injury-in-fact.

The district court went on to state, "[i]t is noteworthy that the White House strategy document…states that it 'does not purport to alter or preempt existing statutes, regulations, policies, or the requirements of the Federal, state, or local agencies that enforce them.' Accordingly, the plaintiffs do not have standing to claim that the ADL has violated its rights by assisting the federal government in its development of the National Strategy." (SPA-13).

Said statement in the National Strategy is, in fact, noteworthy because the very thing it purports not to do is the very thing that is happening. For instance, and as stated in the SAC, the office of Governor Kathy Hochul of the State of New York announced that it was the first state in the Nation to adopt the National Strategy as a guiding document to alter, adjust, and/or develop policies, and potentially criminal laws, in the State of New York in conformity with the policy statements outlined in the National Strategy. (A-91, ¶369).

Said threat of prosecution, as stated in the SAC, was articulated by the governor when she said, "we will continue taking action to fight antisemitism and use every tool at our disposal to eliminate hate and bias from our communities." (A-

84, ¶¶325-32; A-91, ¶371). Said "elimination of hate and bias" can reasonably come in the form of criminal prosecutions as articulated in the SAC.

In addition, the New York Attorney General's website reads, "[w]hile the Attorney General acts independently of the Governor, the Governor or a state agency may request the Attorney General to undertake specific criminal investigations and prosecutions." (A-99-100, ¶419; A-361-63).

A case that is instructive on this point is *Bantam Books, Inc. v. Sullivan*. 372 U.S. 58 (1963). In *Bantam,* the Supreme Court addressed the issue of whether a government commission's non-binding recommendations to booksellers and distributors, advising them to stop selling certain books deemed "objectionable," amounted to an unconstitutional prior restraint on free speech. *Id.*, at 71. The Supreme Court found that these recommendations, though non-binding, effectively curtailed the circulation of the books and thus, constituted a form of state censorship.

Specifically, the Supreme Court noted in *Bantam*:

> It is true that appellants' books have not been seized or banned by the State, and that no one has been prosecuted for their possession or sale. But though the Commission is limited to informal sanctions -- the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation -- the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief. *Id.*, at pp.66-67.

Here, while Minister Farrakhan has not been arrested yet by New York law enforcement authorities – just as no books in *Bantam* had been seized or banned by the state, and that no one had been prosecuted for possession and sale of any of the "objectionable" books – the ADL's COMBAT antisemitism plan that became the National Strategy, as alleged in the SAC, amply sets forth its intent to coerce and/or persuade government entities to act on the recommendations included therein to identify and prosecute anyone it deems to be anti-Semitic, particularly, one it claims to be "a leading promoter of antisemitism in America today."

Thus, the SAC sufficiently pled an injury that was concrete and imminent.

**Issue 3 – The SAC sufficiently pled facts to demonstrate that its injury-in-fact was fairly traceable to the ADL.**

The SAC made factual allegations in Count 3 that the ADL caused the cancellation of the N.O.I.'s streaming account on the Vimeo platform when it communicated with Vimeo to have the account cancelled. (A-88, ¶352). The SAC provided similar illustration of how the ADL caused the cancellation of a previous agreement to have an event hosted on another platform.

Specifically, the SAC stated, "…in 2020, representatives of ADL either visited or communicated with Foxsoul TV to get them to cancel the airing of Minister Farrakhan's July 4, 2020, message entitled, 'The Criterion'. After Foxsoul cancelled its airing… [the] ADL took credit for the cancellation." (A-88, ¶378).

The SAC then stated, "[u]pon information and belief, ADL took similar steps with the streaming platform 'Vimeo' where the Nation of Islam once had a streaming account." (A-88, ¶350). Thus, the SAC alleged that the ADL "either visited or communicated with [Vimeo] to get them to cancel [the N.O.I.'s streaming account.]" These allegations reference actions conducted by the ADL to infringe upon the N.O.I.'s First Amendment rights. Said allegations addressed specific actions by the ADL and did not address its "general advocacy." Thus, the SAC sufficiently pled facts that, when accepted as true, can reasonably establish that Vimeo's cancellation of the N.O.I.'s streaming account was fairly traceable to the ADL.

The district court, however, in its ruling, turned to the cancellation letter issued by Vimeo and the justification Vimeo used to cancel the service as the basis for its ruling that, from its perspective, there was a justified reason for the cancellation. The district court specifically stated that Vimeo, "cancelled NOI's user account due to violations of Vimeo's Terms of Service and Community Guidelines…." (SPA 14-15). The district court then made reference to a hyperlink in the Vimeo cancellation notice that, from its perspective, justified the cancellation of the account. (SPA-14).

Said actions by the district court constituted a weighing of evidence which would be apropos at the summary judgment stage of litigation but not at the pleading stage. With respect to the standard at the pleading stage of litigation, the SAC did plead specific infringing actions that were "fairly traceable" to the ADL.

**Issue 4 – The SAC sufficiently pled injuries to the N.O.I. and its members for violation of their free exercise of religion resulting in reputational harm and a chilling effect on its religious activities within both the City and State of New York as a result of the threat of sanctions by both City and State officals.**

"A future injury constitutes an Article III injury 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McMorris v. Carlos Lopez*, 995 F.3d 295, 300 (2d Cir. 2021).

"[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights[.]" *Steffel v. Thompson*, 415 U. S. 452, 459 (1974).

"When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

Count 4 of the SAC sufficiently alleged every element needed to support a claim that the ADL violated the Nation of Islam and its members' rights to free exercise of religion pursuant to 42 U.S.C. §1983.

Specifically, the SAC alleged that the ADL's "close nexus" and "entwinement" with both state and city government, and the "public function" it performs renders it, for all intents and purposes, a quasi-governmental entity capable of violating 42 U.S.C. §1983. (A-90-97, ¶¶360-405; A-100-04, ¶¶422-42).

The SAC also alleged multiple types of harm to the Nation of Islam. With respect to reputational harm, the SAC specifically alleged that the ADL's "contemporary actions of spying on and surveilling the Nation of Islam, coupled with its 'partner[ship]' with the City of New York to guide its law enforcement departments in the apprehension and prosecution of people it determines is [espousing and exhibiting] 'hate,' serves to diminish the Nation of Islam's reputation in the community. (A-108, ¶464).

The district court revised the N.O.I.'s allegations when it said, "[i]n other words, the alleged reputational harm will occur only if NOI or its members commit and are then prosecuted for hate crimes." (SPA-17). That, however, was not the N.O.I.'s allegation. It was the ADL's "contemporary actions of spying on and surveiling the Nation of Islam" as it has acknowledged it has done historically, that causes current reputational harm to the N.O.I.

With respect to the threat of sanctions, the SAC pled facts identifying threats by the governor of the State of New York and the New York state attorney general against what it determined to be "hate" and "antisemitism." *Supra*, p. 13. The SAC also made reference to the mayor of New York wherein he publicly threatened the use of "law enforcement" to combat what and who the ADL determines to be anti-Semitic based upon the publicly acknowledged "partnership" between the City of New York and the ADL to identify and combat "feeders of antisemitism" (A-101,

¶428; A-109, ¶468). This is not an abstract or vacuous threat against the N.O.I. It is concrete, particularized, and imminent considering the City of New York's "partner[]" – the ADL – has routinely and unabashedly referred to the N.O.I. as "a leading promoter of antisemitism in America today," and it has publicly claimed that Minister Farrakhan and the N.O.I. are responsible for alleged anti-Semitic statements and actions of others. (A-351-58). Said another way, Minister Farrakhan and the N.O.I. are "feeders of antisemitism," and, therefore, Plaintiffs would, from their perspective, be logical and legtimiate targets of the public threats made by the governor of New York and the mayor of New York City.

The district court ruled with respect to Count 4 that, "the threat of sanctions is…entirely speculative and thus not a sufficient basis for standing." (SPA-16). The U.S. Supreme Court, however, has held, "where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 128-129 (2007).

The ADL is "the basis for the threat" made by the governor and the mayor and, thus, Plaintiffs filed this lawsuit to challenge the ADL on their false claims about Minister Farrakhan and the N.O.I.

With respect to the ADL's actions that produced a chilling effect on the N.O.I., the SAC alleged that the statements by the ADL's governmental partners produced

a chilling effect on the N.O.I.'s desire to hold national events in New York. (A-109-10, ¶¶ 471-72). At the pleading stage, the N.O.I. did not have a burden to produce evidence to support that allegation because of "the low threshold" at the pleading stage.

The district court, however, held the N.O.I. to a higher burden when it granted the ADL's Rule 12(b)(1) motion because the N.O.I. did not produce any evidence that it was intending to come to New York before the filing of the lawsuit. (SPA-16). *Susan B. Anthony List* is instructive on this point.

The Court in *Susan B. Anthony List* held that an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging state action. 573 U.S. at 158. The *Susan B. Anthoy List* Court made reference to *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988). In *Virginia*, the Court stated:

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution. (Citations omitted). *Id.*, at 392-93.

Following this line of reason, the nature of the SAC is pre-enforcement. It alleged that the ADL's false labeling of the N.O.I. "a leading promoter of antisemitism in America today" and the memorialization of its plan in the National Strategy produces a chilling effect on its religious practices and activities. (A-109-

13, ¶¶471-72, 480-94; A-114, ¶¶498-502; A-117-18, ¶¶519-25). This chilling effect is due to the credible threat of legal jeopardy, which reasonably deters the N.O.I. from fully exercising its Constitutionally protected First Amendment rights.

Another case that is instructive is *John v. Whole Foods Mkt. Grp. Inc.* 858 F.3d 732 (2d Cir. 2017). In *John*, the plaintiff filed a class action lawsuit against Whole Foods claiming that it overcharged people who purchased certain prepacked items and he was one of them. "The complaint does not identify a specific food purchase as to which Whole Foods overcharged John. Instead, it more generally describes pervasive overcharging of pre-packaged food throughout Whole Foods' stores in New York City." *Id.* at 734. Whole Foods filed a motion to dismiss allegeing the plaintiff did not have standing and the district court granted said motion.

In reversing the district court, this Circuit noted, "[a]t the pleading stage, John need not prove the accuracy of the DCA's findings or the rigor of its methodology; he need only generally allege facts that, accepted as true, make his alleged injury plausible." *Id.* at 737. This Circuit went on to note:

> John may ultimately be unable to show he was injured under the more demanding standards applicable at summary judgment or trial. Of course, we understand the district court's concern that John faces what may be significant evidentiary obstacles on the merits; but targeted discovery might show whether those obstacles can be surmounted. For present purposes, John has plausibly alleged a nontrivial economic injury sufficient to support standing: according to the DCA's investigation, Whole Foods packages of cheese and cupcakes were systematically and routinely mislabeled and overpriced, and John regularly purchased Whole Foods

21

packages of cheese and cupcakes throughout the relevant period. Taking these allegations as true and drawing all reasonable inferences in his favor, it is plausible that John overpaid for at least one product. John's complaint thus satisfies the "low threshold" required to plead injury in fact. (citations omitted). *Id*. at 737-38.

In the case at bar, the SAC alleged the "partnership" between the ADL and the state and city of New York, that the ADL took credit for the passage of the National Strategy, it quoted both the governor and mayor of the City of New York alleging the intention to "eliminate" those who fall into the category of anti-Semites by the ADL's standards, that the mayor intended to use law enforcement to pursue, arrest, and prosecute "feeders of antisemitism," and that the ADL considers the entire N.O.I., particularly Minister Farrakhan, as "a leading promoter of antisemitism in America today." The facts alleged in the SAC are as strong, if not stronger, than the facts alleged in *John* to establish standing sufficient at the pleading stage of this litigation.

Thus, the SAC sufficiently pled facts that, when accepted as true, establishes injury that is concrete, particularized, and imminent.

**Issue 5 – The SAC sufficiently alleged facts to establish that the ADL's surveillance and false labeling infringes upon the N.O.I. and its members' right to freedom of association resulting in, among other things, impairment of reputation.**

Count 5 of the SAC sufficiently alleged every element needed to support a claim that the ADL violated the N.O.I. and its members' rights to freedom of

association pursuant to 42 U.S.C. §1983. Specifically, Count 5 alleged that the ADL's actions of falsely labeling the N.O.I. and it's members as being "a leading promoter of antisemitism in America today" and its "partnership" with the New York State and local officials to "eliminate" the "feeders of antisemitism" using law enforcement produced injuries to the N.O.I. and its members of disassociation due to impairment of reputation, a chilling effect on the association of nonmembers, and a chilling effect as a result of being targets of surveillance by the ADL. (A-114, ¶501; A-115-18, ¶¶ 508-25).

The district court, in its ruling, limited the alleged harm to "occur only if NOI or its members commit and are then prosecuted for hate crimes." (*Supra*, p. 18). The SAC, however, never said the reputational harm to the N.O.I. and its members "will only occur" if they "commit and are then prosecuted for hate crimes."

In fact, the SAC makes reference to the contemporary surveiling of the ADL on the N.O.I. and its members that contributes to the current and ongoing reputational harm. (A-115-18, ¶¶508-25). Said allegations are not conditioned upon future actions. The allegations speak to present-day actions by the ADL and their impact on the N.O.I. and its members.

Thus, Count 5 of the SAC sufficiently pled facts to establish at the pleading stage of litigation that the actions of the ADL unlawfully infringe upon the N.O.I. and it's members' First Amendment right to freedom of association.

**Issue 6 – The N.O.I. sufficiently pled facts in Counts 4 and 5 of the SAC to establish its standing for itself and on behalf of its members to bring claims against the ADL pursuant to 42 U.S.C §1983.**

"[N]othing prevents an organization from bringing a §1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing as enumerated in *Lujan*." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) citing, *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir.1998)(citations omitted).

To assert such organizational standing, an entity must show that 1) it faces "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable," 2) "its injury is fairly traceable" to the challenged conduct, and 3) "a favorable decision would redress its injuries." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation marks omitted). The injury requirement is satisfied so long as the challenged action "perceptibly impaired" the organization's activities, as opposed to merely harming its "abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). We have made clear that an organization may suffer the requisite injury when it "diverts its resources away from its current activities" or otherwise incurs "some perceptible opportunity cost." *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 129-30 (2d Cir. 2020) (internal quotation marks omitted).

The SAC specifically alleged, among other things, that the regular, continuous, and customary propagation of the faith through the public selling of *The Final Call* newspaper, which contains the Teachings of the Most Honorable Elijah Muhammad in every edition, have been and will continue to be infringed upon by the ADL through its partnership with state and local government in New York if said actions are not curtailed through judicial means. (A-112-13, ¶¶488-94).

The district court, in its ruling, made no issue out of the N.O.I. bringing a §1983 action on its own behalf. It did, however, hold that the N.O.I. was unable to assert §1983 claims on behalf of its members. (SPA-17). The district court cited *Nnebe v. Daus* for the premise that "an organization does not have standing to assert the right of its members in a case brought under 42 U.S.C. §1983," because the rights secured by §1983 are "personal to those purportedly iniured." *Nnebe*, 644 F. 3d at 156. (SPA-17).

The U.S. Supreme Court, however, has long recognized that an association may have standing to sue as the representative of its members, "[e]ven in the absence of injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). In *NAACP v. Alabama*, the Supreme Court held that the organization "argue[d] . . . appropriately the rights of its members, and that its nexus with them [wa]s sufficient to permit that it act as their representative before this Court." 357 U.S. 449, 458-59 (1958). See, *National Motor Freight Assn. v. United States*, 372 U.S. 246 (1963). ("Even in the

absence of injury to itself, an association may have standing solely as the representative of its members.")

An organization can establish standing to sue on behalf of its members by showing that (1) "its members would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); see also *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).

The 2nd Circuit has similarly stated that a union's "standing to assert the First and Fourteenth Amendment rights of association and privacy of its individual members is beyond dispute." *Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n of N.Y. Harbor*, 667 F.2d 267, 270 (2d Cir. 1981).

While Appellants submit, generally, that organizations do not have standing to assert the rights of their members in §1983 cases, under the circumstances attendant to this particular matter at bar, such a consideration is warranted.

Mutiple cases sounding in associational standing on behalf of its members addressed issues that only affected a subset of the membership or the class. In this instance, the injury caused by the Defendants ill-effects each member of the N.O.I. equally. There is no special subset needed to address a specific ill-effect of the harm.

Additionally, the Defendants also specifically intended the harm to ill-effect every member of the N.O.I., not a subset. Thus, the time and circumstances may be ripe to consider how associational standing could apply to §1983 cases.

Appellants maintain that based on the face of its SAC, the chill on members' First Amendment rights is fairly traceable to Defendants' actions and their injury would be redressed by a favorable verdict enjoining ADL from seeking to infringe upon the N.O.I.'s First Amendement rights.

The First Amendment gives individuals the right to associate to further their personal beliefs. *Healy*, 408 U.S. at 181 The core tenets of the N.O.I., by way of the Muslim Program and What the Muslims Believe, and the obligation to proselytize the faith by, among other things, door to door engagement and the distribution of its periodicals, namely *The Final Call* Newspaper, while donning of Muslim garments and the wearing of bow-ties and suits, makes the individual member clearly visible and distinguished from any other group in the community. Consequently, the N.O.I. and its members are in every practical sense identical. See, *NAACP v. State of Alabama*, 357 U.S.at 459 ("The Association, which provides in its constitution that '(a)ny person who is in accordance with (its) principles and policies…may become a member, is but the medium through which its individual members seek to make more effective the expression of their own views.'")

In this type of litigation, to require an individual member of a religious organization to assert his and her own §1983 claim against the very defendant who deprives his religious organization of its Federally protected rights would require the individual to abandon the veil of protection that his religious association and affiliation affords, or forever remain silent and suffer the consequences of the abridgment of his Federally protected rights and chill his and her right of association. In other words, without an expansion on the requirements of a §1983 Plaintiff specific to religious organizations to assert claims on behalf of its parishioners, where, as here, the N.O.I. and its members are in every practical sense identical, individuals would, in essence, be required to file claims in order to freely exercise their choice of religion if that religious organization, which has as its core tenets the proselytizing of the faith, is precluded from doing so.

"[I]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute (an) effective restraint on freedom of association. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." (Citations omitted). *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).

28

This is not an instance of name-calling by ADL; quite the contrary. This is a matter against the ADL challenging its actions under color of law, through its delegated public function investigative authority, of falsely labeling Appellants as anti-Semitic and a hate group, the consequences of which flow directly to its members. Consequently, listing a member as a party plaintiff where the organization is of a religious nature, exposes individual members to potential harm and ridicule.

In the case at bar, however, the injury pled is one that is equal and identical in its application to every member of the N.O.I., as an organization and individual. Thus no separate inidividualized pleading of harm is required. Appellant acknowledges this Circuit's ruling in *Nnebe* wherein it stated, in part, that individual panels are bound "by the implicit determination of prior panels that the rule survives Warth 'until such time as [our prior decisions] are overruled either by an en banc panel of our Court or by the Supreme Court.'" *Nnebe*, 644 F.3d at 156 n.5 (alteration in original)(quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)). The circumstances of the case at bar warrants such a consideration.

Lastly on this issue, although the district court was required to draw all reasonable inferences in favor of the Plaintiff, it is not apparent that it drew any reasonable inferences in favor of the Plaintiff. Moreover, in its ruling, the district court cited *Nnebe* and *Lujan* to support its ruling, however, none of those cases were decided at the pleading stage. Each of them were at summary judgment stage where

the standing burden is much higher than at the pleading stage. Thus, when using the apropos burden for the pleading stage, Appellants respectfully offer that the SAC meets and exceeds the elements necessary to overcome a Motion to Dismiss pursuant to 12(b)(1) with respect to Counts 1-5.

**Issue 7 – The SAC sufficiently pled facts to state claims for defamation.**

To adequately state a claim for defamation, a plaintiff must allege: 1) a "defamatory statement of fact concerning the plaintiff;" 2) "publication to a third party;" 3) "fault (either negligence or actual malice depending on the status of the [defamed] party);" 4) "falsity of the defamatory statement;" and 5) "special damages or *per se* actionability." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Count 7 of the SAC adequately pled facts to meet every element of a claim for defamation for multiple statements made by the Defendants.

To distinguish fact from opinion, this Court considers several factors including: 1) whether the language has a precise meaning that is readily understood; 2) whether the statement is capable of being proven true or false; and 3) whether the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such to signal to readers that what is being read or heard is likely to be opinion, not fact. *Elias v. Rolling Stone LLC*, 872 F.3d 97, 110 (2d Cir. 2017).

Count 7 of the SAC adequately pled facts to meet every element of a claim for defamation for multiple statements made by the Defendants and none of the statements were made with privilege or authorization and all constituted defamation *per se* because they all sought to disparage him in the way of his "office" and "profession."

### A. The SAC adequately pled a claim for defamation with regard to the ADL and Mr. Greenblatt falsely alleging that Minister Farrakhan referred "to Jews 'as Termites'"

One defamatory statement alleged in the SAC was that the ADL and Mr. Greenblatt wrote the CEO of Ticketmaster and falsely stated, "Farrakhan refer[ed] to Jews as termites." (A-131, ¶552; A-305-08).

The SAC pled that the ADL published said letter on its website, (A-120, ¶537), that it was made with actual malice, (A-122-31, ¶¶545-51; A-131-34, ¶¶555-72), that it was false (A-131, ¶¶552-54), and that it constituted *per se* defamation because said statement served to "disparage" Minister Farrakhan "in the way of his office, profession, or trade[.]" (A-137-38, ¶¶587-94; A-141-42, ¶¶614-19).

To support the claim of actual malice, the SAC alleged: : 1) the statement was a material alteration of Minister Farrakhan's words (A-131-32, ¶¶555-61), and 2) the ADL and Mr. Greenblatt made the statement with knowing falsity and that false statement impugned his status as a religious leader. (A-133-34, ¶¶562-72).

31

The district court, in granting the ADL and Mr. Greenblatt's Motion to Dismiss pursuant to Rule 12(b)(6), acknowledged that the statement regarding the word "termite" raised in Count 7 constituted a statement that "does have 'a precise meaning which is readily understood," and that "[i]t is either true or false that [Minister] Farrakhan has said so." (SPA-22). Therefore, said statement constituted fact and not opinion.

The district court, however, held that the SAC did not "allege[] facts allowing a reasonable inference of either falsity or actual malice." (SPA-22).

With respect to "falsity," the SAC clearly stated, "[s]ince Minister Farrakhan never referred to 'Jews as "termites[,]'" since he made respectful statements about Jewish people immediately after using the word 'termite,' and since said Defendants would have heard him refer to the circumstance of adultery as 'a termite' and not the adulterer as such, then said Defendants' published declaration that Minister Farrakhan referred to 'Jews as "termites"' was done with knowing falsity." (A-134, ¶571).

With respect to "actual malice," the Supreme Court has held that material alteration of a person's words can constitute a knowing falsity for purposes of establishing "actual malice" when "the alteration results in a material change in the meaning conveyed by the statement." (Citations omitted). *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991).

Neither the ADL nor Mr. Greenblatt can prove that Minister Farrakhan said "Jews are termites" because, as noted above, he never made any such statement.

Since Minister Farrakhan never made such a statement, the SAC "did [] plead facts that would raise a reasonable expectation that discovery will reveal evidence that Greenblatt or the ADL made the statement with knowledge of or reckless disregard as to the statements falsity." (SPA-23).

Additionally, the SAC included the full context of the speech wherein Minister Farrakhan used the word "termite," and said context clearly established that there was no negative connotation ascribed to Jewish people. (A-131, ¶556). Both before and after his use of the term "termite," Minister Farrakhan showed utmost respect for Jewish people.

Furthermore, the SAC alleged what Minister Farrakhan meant by the use of the term termite, which has no reference to Jews at all but to the eroding of a society. (A-133, ¶565).

To materially alter his words to falsely claim that he "referred to Jews as termites" is evidence of actual malice in addition to the other allegations of actual malice set out in the SAC. (A-131-34, ¶¶552-72).

Thus, the full context of the statement does "raise a reasonable expectation that discovery will reveal evidence" that the ADL and Mr. Greenblatt "made the statement with knowledge of or reckless disregard as to the statement's falsity"

33

because they could not have used the word "termite" unless they heard the speech themselves, and if they claim they never heard the speech and the full context of the usage of the word, said acknowledgment would constitute a "reckless disregard as to the statement's falsity."

For said reasons, when accepting all well-pled facts as true and when drawing all reasonable inferences in favor of the plaintiff, the SAC, at the pleading stage, sufficiently stated a claim for defamation upon which relief could be granted with respect to the ADL and Mr. Greenblatt fasley stating that he "refer[ed] to Jews as 'termites.'"

**B. The SAC adequately pled a claim for defamation with regard to the ADL and Mr. Greenblatt's mischaracterization of Minister Farrakhan's use of the phrase "Satanic Jews."**

The SAC alleged that the ADL and Mr. Greenblatt, "wrote in its February 9th letter that Minister Farrakhan used the phrase, 'Satanic Jews.'" (A-134, ¶573; A-305-08). The SAC further alleged that the ADL and Mr. Greenblatt, "quoted that statement out of context, and, coupled with its other statements in said letter, published to its readers said quote as if Minister Farrakhan referred to all Jews as 'Satanic' or that only Jews can be Satanic." (A-135, ¶574).

Moreover, the SAC alleged that the ADL and Mr. Greenblatt knew that Minister Farrakhan has historically used the word "Satanic" in reference to the

"actions of some people who claim faith, yet commit acts in direct contradiction to the faith tradition they claim." (A-135, ¶575). The SAC even included a quote from Minister Farrakhan wherein he referred to Muslims who strap bombs on themselves and blow up innocent people as "Satanic." (A-135, ¶576).

The ADL and Mr. Greenblatt's acknowledgements that they track Minister Farrakhan words establishes the knowing falsity in the mischaracterization of his words when they gave the impression that he referred to all Jews as "Satanic." (A-135, ¶577-79). Said knowing falsity establishes the statement was made with actual malice.

The district court, in its ruling, made reference to a hyperlink included in the published communication to the CEO of Ticketmaster that would take the reader to other statements allegedly made by Minister Farrakhan. (SPA-22). The district court specifically noted that, "[s]everal of those direct quote include Farrakhan's use of the phrase 'satanic Jews.'" (SPA-22).

As noted, however, the SAC clearly alleged that the ADL and Greenblatt's reference to the statement was taken out of context and the Supreme Court has held that, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact" and can still constitute defamation. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990).

For said reasons, when accepting all well-pled facts as true and when drawing all reasonable inferences in favor of the plaintiff, the SAC, at the pleading stage, sufficiently alleges a claim for defamation with respect to the ADL and Mr. Greenblatt's intentional mischaracterization of Minister Farrakhan's use of the phrase "Satanic Jews."

### C. The SAC adequately pled a claim for defamation with regard to the ADL and Mr. Greenblatt falsely labeling Minister Farrakhan as an "anti-Semite."

The SAC adequately pled that the ADL and Mr. Greenblatt's false labeling of Minister Farrakhan as an "anti-Semite" constitutes defamation.

Specifically, the SAC alleged that the ADL and Mr. Greenblatt falsely labeled Minister Farrakhan as being "anti[-S]emitic" in its October 20, 2022, article entitled "Extremists Are Praising Kanye West's Antisemitism, Parlor Acquisition," (hereinafter, "West Article"). (A-120, ¶534)(Dkt. Entry 10.2, ECF Doc. 33, #75, Exhibit III).

The SAC further alleged that said false labeling constituted defamation particularly when they referred to Minister Farrakhan as, "one of the most notorious antisemites in the country." (A-135, ¶179).

The SAC also alleged that they "did not disclose any facts to the reader of the online post to accompany the false statement that Minister Farrakhan is 'anti[-

S]emitic.'" (A-120, ¶535). It also alleged that, "[a] reader of that online post would readily understand that Defendants ADL and Greenblatt relied on certain facts that were unknown and unstated to the reader that supported said false statement that Minister Farrakhan is 'anti[-S]emitic." (A-120, ¶536). The SAC alleged the ADL and Mr. Greenblatt made a similar defamatory statement in the February 9, 2023, letter to the CEO of Ticketmaster. (A-120, ¶537).

The district court ruled that said references to Minister Farrakhan being anti-Semitic were "non-actionable opinion[]" because they contained "a recitation of the facts on which [they are] based," and, therefore, "cannot be 'reasonably understood as implying the assertion of undisclosed facts justifying the opinion.'" (Citation omitted)(SPA-21-22). Said references in the context in which they were used by the ADL and Mr. Greenblatt, however, do not constitute opinion, but constitute statements of fact because they are capable of being proven false.

The term anti-Semite does have a precise meaning in American society, and/or as used by the ADL. The SAC alleged that the precise meaning as applied by the ADL is, "one who dislikes, hates, or attacks persons who identify as Jewish." (A-63, ¶¶197-98).

Notably, falsely labeling a person as "anti-Semitic," depending on the context, can be considered a defamatory statement of fact. *Egazarian v. Zalmayev*, 880 F.Supp. 494, 513 (S.D.N.Y. 2012).

Additionally, the Second Circuit has held that making false statements, in the name of advocacy, can be defamation. "The mere fact that Defendants engage in advocacy does not give them blanket immunity to make false accusations. Indeed, none of the authorities…stand[] for the proposition that advocacy cannot as a matter of law give rise to a defamation claim. *See Egiazaryan,* 880 F.Supp.2d at 510 (stating that speech including epithets, fiery rhetoric, and hyperbole signal advocacy, not that advocacy is protected speech); *Brian,* 87 N.Y.2d at 53, (noting that the context in which challenged statements were made—an Op–Ed piece "rife with rumor, speculation and seemingly tenuous inferences"—supported conclusion that accusations of an illegal conspiracy could not have been understood by a reasonable reader as assertions of fact); *Yang v. Shanghai Cafe Inc.,* No. 10 Civ. 8372, 2012 WL 398641, at 4 (S.D.N.Y. Feb. 8, 2012) (finding that restaurant workers' flyers advocating boycott of restaurant for wage theft contained statements of pure opinion because of, *inter alia,* the flyers' tone and title—"Dumpling Festival Corporate Sponsor ... Exploits Workers and Should be Punished"—and the use of the word "exploit"). *Restis v. Am. Coal. Against Nuclear Iran, Inc*., 53 F. Supp. 3d 705, 722 (S.D.N.Y. 2014).

Clearly the broader social context and surrounding circumstances suggest to readers that whenever the ADL labels a person as being antisemitic it signals to readers that what is being read is fact. (A-121-22, ¶¶538-44).

Assuming, *arguendo*, that the false labeling of Minister Farrakhan as an "anti-Semite" by the ADL and Mr. Greenblatt constituted opinion, it should still be considered actionable because both articles implied undisclosed facts, false facts, and/or facts taken out of context.

In the West Article, no facts were disclosed to the reader that contained any recitation of facts upon which the opinion could be based on. (A-120, ¶¶534-36). The Ticketmaster letter did contain a hyperlink, as noted by the district court, but the quotes exclude any context, fail to provide explanations of what was said before or after partial quotes, and otherwise does not accurately present Minister Farrakhan's views.

Furthermore, the ADL provides no disclaimers indicating that its words reflect its opinion or interpretation. Thus, by not disclosing any facts to the reader of the publication, the ADL and Mr. Greenblatt, provided, in the alternative, actionable mixed opinion.

The SAC also adequately pled actual malice when it articulated the ADL's history of reckless disregard for the truth, in the name of advocacy, when it comes to statements made by Minister Farrakhan. (A-122-30, ¶¶545-50). The ADL established its actual malice in referring to Minister Farrakhan in the derogatory and defamatory term of "anti-Semite" by its refusal to refer to Jewish scholars and historians as being "anti-Semitic" when they have said similar, if not more

elucidating statements about certain topics involving some people who identify as Jewish. (A-130, ¶550).

For said reasons, when accepting all well-pled facts as true and when drawing all reasonable inferences in favor of the plaintiff, the SAC, at the pleading stage, sufficiently alleges a claim for defamation with respect to the ADL and Mr. Greenblatt referring to him as an "anti-Semite" or as being "anti-Semitic."

**D. The SAC adequately pled a claim for defamation with regard to the ADL falsely claiming that Minister "Farrakhan Predicts Another Holocaust."**

The SAC adequately pled that the ADL committed defamation when it falsely claimed that Minister "Farrakhan Predict[ed] Another Holocaust."

Specifically, the SAC alleged, "[o]n February 27, 2023, on its official website, Defendant ADL posted a letter entitled, "Farrakhan Predicts Another Holocaust…in Saviours' Day Speech." (A-136, ¶580; A-351-58). The SAC further alleged that said false statement was "not a statement of opinion; it either happened or it did not[,]" and that said false statement was "capable of being proven as false, because Minister Farrakhan never predicted 'another holocaust.'" (A-136, ¶¶581-82).

The district court ruled that said statement about predicting another holocaust "appears at first blush to be a statement 'capable of being proven true or false,'" but held that it "is likely to be opinion, not fact" based upon "the full context of

the communication in which the statement appears [and] the broader social context and surrounding circumstances[.]" (SPA-21). The district court then made reference to "direct quotes from the speech" and that the article's "title is an interpretation of the facts disclosed within the article." (SPA-21-22).

Said statement, however, is not a statement of opinion because he either said it or he did not and the allegations contained in the SAC clearly stated that he made no such prediction. (A-136, ¶582). Moreover, in the body of the article there is nothing to suggest Minister Farrakhan was predicting a holocaust. Thus, there was nothing to be interpreted by the district court, and the broader context of the article made no mention of the Holocaust.

Furthermore, either the ADL listened to his words from Saviours' Day and materially altered what he said, or they did not listen to his words and made such a statement in reckless disregard for its falsity. The ADL publishing such a false statement is another example of their altering his words and further demonstrates their actual malice as was pled in the SAC. (A-136, ¶¶583-86).

For said reasons, when accepting all well-pled facts as true and when drawing all reasonable inferences in favor of the plaintiff, the SAC, at the pleading stage, sufficiently alleged a claim for defamation with respect to the ADL and Mr. Greenblatt claiming that he predicted another holocaust in his Saviours' Day 2023 address.

**E. The SAC adequately pled a claim for defamation with regard to the SWC falsely claiming that Minister Farrakhan used the phrase "Synagogue of Satan" to "Demonize Judaism."**

The SAC adequately pled that the SWC committed defamation when it falsely claimed that Minister ""Farrakhan used the phrase Synagogue of Satan" to "Demonize Judaism."

Specifically, the SAC alleged that, SWC and Mr. Cooper published a false statement on March 1, 2023, on its official website when they wrote, "Farrakhan invoked the New Testament's 'Synagogue of Satan,' to demonize Judaism and those who revere the Torah." (A-144, ¶631; A-211-14). The SAC further alleged that said statement by SWC and Mr. Cooper, "is not a statement of opinion, it is a statement of fact; he either engaged in that specific act or he did not, and he did not." (A-144, ¶633).

The district court, as it did with the alleged predicting another holocaust statement, held that while this statement could be considered a statement of fact, it "is likely to be opinion, not fact." (SPA-21).

Assuming, *arguendo*, that SWC and Mr. Cooper's statement that Minister Farrakhan used the phrase "'Synagogue of Satan' to demonize Judaism" constituted opinion, it should still be considered actionable. Contrary to the district court's ruling, said article did not disclose any facts to the reader that could be relied upon as the basis for the faulty opinion contained in the article. The full Article contained

no accurate account of Minister Farrakhan's words from his Saviours' Day speech. The full article contained no quotes.

Thus, by not disclosing any facts, or accurate facts, to the reader of the publication, the SWC and Mr. Cooper provided, in the alternative, an actionable mixed opinion.

With respect to actual malice, the SAC adequately alleged actual malice because the SWC and Mr. Cooper: 1) materially altered Minister Farrakhan's words (A-145, ¶¶635-40), 2) historically have materially altered his words (A-145, ¶641), and 3) made such statement with known falsity. (A-146, ¶¶642-45).

For said reasons, when accepting all well-pled facts as true and when drawing all reasonable inferences in favor of the plaintiff, the SAC, at the pleading stage, sufficiently alleged a claim for defamation with respect to SWC and Mr. Cooper's materially altered and false statement that Minister Farrakhan used the phrase "'Synagogue of Satan' to Demonize Judaism.'"

**F. The SAC adequately pled a claim for defamation with regard to the SWC and Mr. Cooper's false claim that Minister Farrakhan committed a crime of "anti-Semitic incitement."**

The SAC adequately pled that the SWC and Mr. Cooper committed defamation when they falsely claimed that Minister Farrakhan committed "anti[-S]emetic incitement."

Specifically, the SAC alleged that SWC and Mr. Cooper published on its websited a false statement on March 1, 2023, that Minister Farrakhan has committed "anti[-S]emetic incitement for four decades." (A-150, ¶669; A-211-14). The SAC also alleged that said statement "was not a statement of opinion [but] was a false statement of fact." (A-151, ¶670).

In support of said statement, the SAC alleged that, "Black's Law Dictionary defines "incitement" as, "the act of persuading another person to commit a crime." (A-151, ¶673). The SAC then alleged that, "Minister Farrakhan has neither 'incite[d]' anyone to harm a Jewish person, nor has he attempted to persuade anyone to cause damage to a Jewish synagogue, or any other property owned by a Jewish person. (A-151, ¶674).

In addition, in and around the defamatory statement of "anti[-S]emitic incitement" are words like "words lead to action and his toxic hatred has been absorbed"….and "at a time when American Jewry is reeling from violent anti-Semitic hate crimes." (A-211-14). A reasonable reader would view this statement as not only factual, but it is plausible that a reasonable reader would understand the "anit[-S]emetic incitement" statement to imply that Minister Farrakhan has incited or encouraged others to commit violence against jewish people.

Said reasonable inference is evidence of actual malice because, as alleged in the SAC, Mr. Cooper either monitors, or receives reports on, practically every word

Minister Farrakhan speaks, therefore, he knew, or should have known, that Minister Farrakhan has never advocated for violence against any Jewish person, or Jewish property. (A-151-52, ¶¶677-78).

For said reasons, when accepting all well-pled facts as true and when drawing all reasonable inferences in favor of the plaintiff, the SAC, at the pleading stage, sufficiently pled a claim for defamation with respect to SWC and Mr. Cooper saying Minister Farrakhan engaged in "antisemitic incitement."

**Issue 8 – The SAC sufficiently pled the ADL is a quasi-governmental actor capable of infringing upon the Plaintiffs' First Amendment rights.**

The Declaratory Judgment Act permits a district court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III" of the Constitution. *MedImmune,* 549 U.S. at 127.

An action seeking declaratory relief satisfies the case-or-controversy requirement, and thus permits the exercise of federal jurisdiction, if the dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests" and is "real and substantial," such that it "admit[s] of specific relief

through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id*.

In the case at bar, in Counts 1-5 of the SAC, Plaintiffs alleged First Amendment violations against the ADL in its capacity as a quasi-governmental actor. Said alleged First Amendment Violations constituted a "definite and concrete" case-or-controversy "touching the legal relations of [the] parties having adverse legal interests[.]" Such adverse legal interests are "real and substantial" considering at stake are bedrock protections guaranteed to every citizen in the First Amendment.

Thus, the proper and adequate resolution of said claims warranted and necessitated a determination of the ADL's status as an alleged quasi-governmental actor.  The determination of the ADL as a quasi-governmental actor is crucial for clarifying its ability to infringe upon the Plaintiffs' First Amendment rights.

The SAC delineates several instances illustrating the ADL's extensive involvement in activities typically reserved for governmental agencies. For instance, the SAC alleged that the ADL played a pivotal role in facilitating the implementation of its COMBAT plan into the Executive Branch of the federal government, resulting in "The U.S. National Strategy to Combat Antisemitism" (A-221-25).

The SAC also alleged, *inter alia*, that the ADL: 1) conducted surveillance and investigations on behalf of the F.B.I., illustrating a "close nexus" and "entwinement" with federal law enforcement agencies, (A-95-97, ¶¶392-405), 2) engaged in two-

way information sharing with the F.B.I., (A-159, ¶¶ 719-22), 3) participated in executive-level meetings with federal agencies, (A-87, ¶¶ 342-45), 4) invited other governmental agencies to meetings with the President of the United States, (A-160-61, ¶¶723-26), and 5) drafted and implemented training modules for the F.B.I., further solidifying its role in shaping law enforcement practices. (A-157, ¶711). Said actions by the ADL alleged in the SAC alleged concretizes the ADL's status as a quasi-governmental actor.

Moreover, multiple F.B.I. directors have publicly acknowledged the close relationship between the ADL and the F.B.I., emphasizing the ADL's "close nexus" and "entwinement" with the federal government. For instance, former F.B.I. Director James Comey stated in a speech at a gathering of the ADL, "[f]rom the perspective of the F.B.I., we're still in love with you[.]" (A-175-76).

Subsequent to him, the successor F.B.I. Director, Christopher Wray, further articulated the daily interactions with and the close cooperation between the F.B.I. and the ADL. (A-156-59, ¶¶707-18). These endorsements reflect an institutional recognition of the ADL's "close nexus" and "entwinement" with federal law enforcement operations.

The ADL's quasi-governmental role extends beyond federal "entwinement" and into "entwinement" with state and local governments as well, which further underscores its quasi-governmental status.

To this point, the ADL's entwinement with New York state government is evident through its active participation in state-level policy and enforcement actions. The SAC detailed instances where the ADL has worked closely with state officials by providing training and advisory services that shape state law enforcement practices and policies (A-93-94, ¶¶380-86). The SAC also referenced how the mayor of New York City publicly acknowledged the city's "partnership" with the ADL. (A-101, ¶¶427-28).

On yet another point, the SAC further alleged how the ADL's ability to solicit funding directly from the Office of Management and Budget (hereinafter, "OMB"), which is historically reserved only for governmental agencies further highlights its status as a quasi-governmental actor. (A-161-64, ¶¶730-46). Tangentially, the ADL also directed the OMB on where to allocate government financial resources. (A-161-62, ¶¶733-35).

With all that said, Plaintiffs are aware of this Court's recent ruling in *Admiral Ins. Co. v. Niagara*, where it reaffirmed that, "district courts retain 'broad discretion' to decline jurisdiction under the DJA[.]" 57 F.4th 85, 99 (2d Cir. 2023).

Here, in declining jurisdiction, the district court ruled that:

> The plaintiffs lack standing on each claim that relies on the theory that the ADL is a federal actor, and plaintiffs have not stated a claim for defamation regarding any of the challenged statements. As such, a declaratory judgment would not clarify any of the legal relations in issue. The Court therefore declines to exercise jurisdiction over claims 10 and 11. (SPA-24).

The plain language of the ruling indicates the district court declined to exercise jurisdiction over claims 10 and 11 because of its determination that Plaintiffs lacked standing to bring any of the claims found in the SAC. If, however, this Court determines that Plaintiffs sufficiently established standing at the pleading stage of this litigation and subsequently remands this matter to the district court, Plaintiffs respectfully request that this Court remand the declaratory judgment claims for possible review and consideration pursuant to the finding of standing.

**Issue 9 - The district court abused its discretion in failing to grant Plaintiffs' request for injunctive relief.**

The elements for the granting of an injunction are: 1) whether the plaintiff is likely to suffer irreparable harm without the injunction, 2) whether the balance of equities and hardships is in the plaintiff's favor, and 3) whether an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The standard for obtaining preliminary and permanent injunctions are identical, except that a permanent injunction does not require a showing of likelihood of success on the merits. *Id.* at 32.

In the case at bar, Appellants sought injunctive relief from the infringing actions of the ADL alleging that the actions of the ADL, as a quasi-governmental actor, were designed to restrain and prevent the free exercise of Plaintiffs' religion

and their freedom of association in violation of the First Amendment. (A-82, A-86, A-89, A-165, ¶¶317, 339, 358, 756).

Specifically, as noted *supra*, the ADL wrote a letter to the CEO of Ticketmaster regarding Minister Farrakhan's 2023 upcoming Saviours' Day address. (A-305-08). In the letter, the ADL claimed that it did not wish to interfere with Ticketmaster's commercial activities. (A-306).

To the contrary, the ADL's true intent was to disrupt, in whatever way it could, Minister Farrakhan's 2023 speaking engagement by using its quasi-governmental weight to adversely influence Ticketmaster. This is evident from the ADL's statement following Saviours' Day 2023 wherein it wrote and expressed its displeasure that Ticketmaster did not cancel the Saviours' Day ticket sales as a result of its Ticketmaster letter. (A-80-82, ¶¶303-15).

Given this background, and the ADL's long history of attempting to interfere in the affairs of the Nation of Islam, the SAC is seeking a redress this grievance through the courts to prevent further attempted and actual First Amendment violations.

The district court committed an abuse of discretion when it denied Plaintiffs' request for injunctive relief. In particular, the District Court interpreted Plaintiffs' request for injunctive as seeking to "enjoin[] defendants from expressing their beliefs regarding plaintiffs." (SPA-24).

Contrary to said statement, nothing pled in the SAC intended to serve as "a prior restraint" on the ADL's speech as stated by the district court. (SPA-24). Specifically, the SAC alleged that the "Defendants should be enjoined from contacting venues ahead of speaking events featuring Minister Farrakhan, or any other speaker of the Nation of Islam, in an attempt to have the event canceled because the identity of the speaker is not decisive in determining whether speech is protected." (A-165, ¶756).

In fact, the SAC lays bare the ADL is the party who attempts to place prior restraints on speech. To do this, they went so far as to attempt to interfere with contractual relationships. Their conduct, both before Saviours' Day 2023 and after, lays bare their attempt to interfere with, disrupt, and/or break the agreement between Ticketmaster and the Nation of Islam.

It is the interference with contractual relationships and associations with third parties that Appellants' seek to curtail, not the ADL's speech or beliefs. Given the ADL's history of real efforts to break agreements they are not a party to, and to inflict real harm, economic and otherwise, on those whom they disagree with, the SAC alleges that they should be enjoined from attempting to have third parties cancel events that they are not a party to. (A-165-166; ¶¶747-57).

The SAC further alleged that Minister Farrakhan will suffer irreparable injury should the ADL not be enjoined, (A-165-66; ¶¶747-57), and that the balance of the

public interest is in favor of allowing free speech, rather than restricting it because restricting speech, as the ADL sought to achieve during Saviours' Day 2023, tramples upon the First Amendment and, as such, is not in the public interest. (A-165-66; ¶¶747-57).

In light of the foregoing the district court abused its discretion in dismissing Plaintiffs' claim for injunctive relief.

**Issue 10 - The SAC sufficiently pled facts which warranted the determination of the false use of the phrase "Anti-Semite" and its derivatives to be the 5th category of defamation *per se*.**

Whether a statement is defamatory *per se* "depends, among other factors, upon the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place." *Mencher v. Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257 (1947). Thus, whether a statement is defamatory *per se* can evolve from one generation to the next.

"Courts have readily held allegations of racism and anti-Semitism to constitute libel *per se*, at least when founded on specific incidents." *Mullemeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 874 (SDNY 1984).

Such false labeling tends to harm the reputation of the person so labeled and lowers him in the estimation of aspects of the community and deters people from

associating with the person so labeled. The impact of being falsely labeled anti-Semitic is severe. And the societal consequences that flow from the accusation, especially when it is false, results in great harm to the reputation, trade, calling, and profession of any person so labeled. (A-154, ¶697).

The SAC adequately pled for the false use of the term "anti-Semite" to be declared the 5th category of defamation *per se*. (A-137-38, ¶¶592-94). The SAC contained sufficient facts for the court to consider that the false labeling of "anti-Semite," or any variation of the word, has a significant defamatory impact.

A careful review of the district court's ruling establishes that the district court did not specifically address the claim raised in Count 10 of the SAC. Thus, the district court abused its discretion by failing to address said claim.

With that said, the time is ripe to consider the expansion of the categories of defamation *per se* to include the false use of the term "anti-Semite," or any of its derivatives, due to the gravity of the impact of such claims.

As noted herein, Plaintiffs are aware of the district court's "broad discretion" under the Declaratory Judgment Act. (*Supra*, p. 49). Thus, Plaintiffs respectfully request that if any part of this appeal is granted and remanded to the district court that this claim be remanded possible review and consideration by the district court.

## <u>CONCLUSION</u>

For the above reasons, Plainitffs respectfully requests this Circuit finds that the SAC sufficiently pled facts at the pleading stage that establishes they have Article III standing to bring the claims alleged therein, that the SAC sufficiently stated claims for defamation upon which relief could be granted, and that the district court abused its discretion is failing to grant the claims of declaratory and injunctive relief.

Dated: July 30, 2024

By: /s/ *Abdul Arif Muhammad*
Abdul Arif Muhammad, Esq.
Pennsylvania Bar #47898
7351 South Stony Island Avenue
Chicago, Illinois 60649
(215) 313-0738) (Phone)
abdularifmuhammad@gmail.com

By: /s/ *Sa'ad Alim Muhammad*
Sa'ad Alim Muhammad, Esq
Illinois Bar #6244757
1525 E. 53rd Street, Suite 447
Chicago, Illinois 60615
(312) 263-5989 (Phone)
SAM@PowerandDixon.com

Respectfully submitted,

By: /s/ *Michael K. Muhammad*
Michael K. Muhammad, Esq.
Texas Bar #00787157
10440 N. Central Expwy, Suite 800
Dallas, Texas 75231
(214) 432-6285 (Phone)
Michael@muhammadlawfirm.com

54

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains <u>12,355</u> words and, thus, is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

By: <u>/s/</u> ***Sa'ad Alim Muhammad***

Sa'ad Alim Muhammad, Esq

# Special Appendix

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

|  | **Page** |
|---|---|
| United Stated District Judge Opinion and Order, dated April 5, 2024 ................................................. | SPA-1 |
| Judgement, dated April 5, 2025 ................................ | SPA-26 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
FARRAKHAN et al.,                        :
                          Plaintiffs,    :
                                         :        23cv9110 (DLC)
              —v—                        :
                                         :        OPINION AND
ANTI-DEFAMATION LEAGUE, et al.,          :            ORDER
                                         :
                          Defendants.    :
                                         :
---------------------------------------- X

APPEARANCES:

For plaintiffs Nation of Islam and Louis Farrakhan:
Abdul Arif Muhammad, Sr.
1515 Market Street Ste 1200
Philadelphia, PA 19102

Michael K. Muhammad
Muhammad Law Firm
1700 Pacific Avenue Ste 3740
Dallaas, TX 75201

For plaintiff Louis Farrakhan:
Sa'ad A. Muhammad
Power and Dixon PC
1525 East 53rd St Ste 447
Chicago, IL 60615

For defendants Anti-Defamation League and Jonathan Greenblatt:
Nathan Ellis Siegel
Davis Wright Tremaine LLP
1301 K St Ste 500 East
Washington, DC 20005

Adam Ivan Rich
Davis Wright Tremaine LLP
1251 Avenue of the Americas
New York, NY 10020

For defendants Simon Wiesenthal Center and Abraham Cooper:
Julie Gerchick
Patricia L. Glaser

Glaser Weil Fink Howard Jordan & Shapiro LLP
10250 Constellation Blvd Ste 1900
Los Angeles, CA 90067


DENISE COTE, District Judge:

Plaintiffs Louis Farrakhan and Nation of Islam ("NOI")
brought suit against the Anti-Defamation League ("ADL"), its CEO
Jonathan Greenblatt, the Samuel Wiesenthal Center ("SWC"), and
Abraham Cooper, SWC's Associate Dean & Global Social Action
Director.  Plaintiffs allege defamation and, against the ADL, a
variety of First Amendment violations.  Defendants have moved to
dismiss the plaintiffs' Second Amended Complaint ("SAC").  For
the following reasons, the motions are granted.

## Background

On January 4, 2024, plaintiffs filed the 150-page SAC,
along with 672 pages of exhibits.  The SAC, which details nearly
a century's worth of grievances, alleges several instances of
defamation and, as against the ADL, various violations of the
plaintiffs' First Amendment rights.  At their core, plaintiffs'
claims are that by repeatedly referring to plaintiffs as
antisemitic, defendants have defamed them and created a chilling
effect on their religious practices.  Plaintiffs seek $4.8
billion in damages as well as a declaratory judgment that the
term "anti-Semite" is defamatory per se and that the ADL is a
quasi-governmental actor that violated plaintiffs' First

SPA-3

Amendment rights.  Plaintiffs also seek to enjoin defendants

from calling them antisemitic or taking any steps to urge third

parties to disassociate with them.

The First Amendment claims allege that the ADL has taken

steps to censor plaintiffs, including by pressuring Ticketmaster

in a 2023 open letter not to sell tickets for NOI's yearly

Savior's Day event, and by causing Morgan State University in

2023 to refuse NOI's request to use its facilities as a venue

for an NOI event.  Plaintiffs also allege that the ADL's work

with various governmental actors to combat antisemitism has had

a chilling effect on NOI, its members, and its prospective

members, including by making NOI less willing to hold events in

New York and its members less willing to sell NOI's religious

newspaper or wear identifiable garments in public.

The defamation claims are centered around the 2023

Ticketmaster open letter and several blog posts and articles

posted to the ADL and SWC websites in 2022 and 2023.  The

defamation claims against the ADL and Greenblatt relate to three

written communications, two of which concern NOI's annual

Saviour's Day conference held in February 2023.  The claims

against SWC and Cooper relate to an article about the Saviour's

Day conference posted on the SWC website in March 2023.

SPA-4

    1.    October 2022 Blog Post

The earliest ADL communication at issue is a blog post
published on the ADL's website on October 20, 2022.  The post is
largely about the rapper Kanye West and his public statements,
but it also refers to the "virulently antisemitic Nation of
Islam and its leader, Louis Farrakhan."

    2.    Open Letter to Ticketmaster Before February 2023
          NOI Event

The next ADL communication is an open letter to the CEO of
Ticketmaster signed by Greenblatt as CEO and National Director
of the ADL ("Ticketmaster Letter").  The Ticketmaster Letter was
published on ADL's website on February 9, 2023, prior to the
February 26 Savior's Day conference.  The letter stated that the
ADL was "not requesting any particular action from
[Ticketmaster] as it relates to your commercial activities" but
"would like to make you aware of Farrakhan's past behavior and
statements."

The Ticketmaster Letter referred to Farrakhan as "one of
the most notorious antisemites in the country."  It also
contained several direct quotes from Farrakhan's prior Savior's
Day speeches, including, inter alia, his 2019 statement that
"[p]edophilia and sexual perversion institutionalized in
Hollywood and the entertainment industries can be traced to
Talmudic principles and Jewish influence"; his 2017 statement

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 29 of 52
Case 1:23-cv-09110-DLC   Document 87   Filed 04/05/24   Page 5 of 25

that "[t]hose who call themselves 'Jews,' who are not really Jews, but are in fact Satan.  You should learn to call them by their real name: 'Satan'"; and his 1996 statement that "[y]ou are not real Jews . . . . You are the synagogue of Satan, and you have wrapped your tentacles around the U.S. government." Farrakhan does not challenge the accuracy of the direct quotes but instead challenges the portions of the Letter that refer to Farrakhan as an antisemite and state that Farrakhan has referred to "Jews as 'termites' and 'satanic.'"

3.    February 2023 Blog Post

The next communication is a February 27, 2023 blog post published on the ADL website after the February 26 Savior's Day conference with the title "Farrakhan Predicts Another Holocaust, Espouses Antisemitism and Bigotry in Saviours' Day Speech."  The post included direct quotes from the speech, such as "[t]he Synagogue of Satan has destroyed the country," as well as the following:

> A Jewish man said to me, 'You know, we say never again.  Never again will we be in the oven.  Never again.'  I said, 'Hold it.'  You can say that to men, but you can't say that to God.  Because the Bible says, behold the day cometh that shall burn -- as a what? -- as an oven.

Again, Farrakhan does not challenge the accuracy of the direct quotes but rather the headline's statement that "Farrakhan Predicts Another Holocaust."

SPA-6

4.   March 2023 SWC Article

The claims against SWC and Cooper involve an article published on the SWC website on March 1, 2023 "condemning [Farrakhan's] anti-Semitic and anti-Judaic diatribes during the Nation of Islam's annual conference in Chicago."  Farrakhan challenges two statements in the SWC article: first, that "Farrakhan invoked the New Testament's 'Synagogue of Satan' to demonize Judaism and those who revere the Torah," and second, that SWC has "tracked and denounced Farrakhan and his . . . antisemitic incitement for four decades."

Plaintiffs filed their initial complaint, which was 76 pages long and contained 504 pages of exhibits, on October 16, 2023.  On November 2, plaintiffs filed a 90-page amended complaint, along with 611 pages of exhibits.  On December 12, 2023, the defendants moved to dismiss the First Amended Complaint.  In response, the plaintiffs filed the 150-page SAC, and its 672 pages of exhibits, on January 5, 2024.[1]  On January 19, the ADL defendants moved to dismiss the SAC pursuant to Fed. R. Civ. P. 8, 12(b)(1), and 12(b)(6).  The SWC defendants moved to dismiss claims 8 to 10 of the SAC on the same day.  The motions were fully submitted on February 9, 2024.

---

[1] An Order of December 13, 2023 informed the plaintiffs that it was "unlikely" that they would have a further opportunity to amend.

6

SPA-7

## Discussion

The defendants have moved to dismiss on several grounds: the prolixity of the SAC, the plaintiffs' lack of standing to bring claims 1 to 5, and the failure to state a claim with respect to any of the claims. This Opinion addresses defendants' arguments in that order.

I.   Fed. R. Civ. P. 8

The ADL's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 8 ("Rule 8") is denied. The ADL argues that the SAC violates Rule 8(d)'s requirement that a complaint be "simple, concise, and direct," and Rule 8(a)'s requirement that the statement of a plaintiff's claims be "short and plain."

The SAC is unnecessarily voluminous and at times difficult to follow. "Unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted). "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. Even though challenging, it is possible to comprehend the allegations and relief sought in the SAC; thus, the Court declines to dismiss the SAC on this basis.

7

SPA-8

II.  Standing

The ADL argues that six claims -- claims 1 to 5 and 11 --
should be dismissed pursuant to Rule 12(b)(1) because plaintiffs
allege no injury-in-fact in relation to those claims and
therefore lack Article III standing.  In these claims, the
plaintiffs assert that the ADL is a federal and state actor that
has violated the First and Fourteenth Amendments of the United
States Constitution.  Plaintiffs have not alleged sufficient
facts to support standing for claims 1 to 5.[2]  They are thus
dismissed without prejudice.  See Clementine Company, LLC v.
Adams, 74 F.4th 77, 90 n.4 (2d Cir. 2023) (noting that
dismissals for lack of Article III standing must be without
prejudice).

Article III standing is "always an antecedent question,
such that a court cannot resolve contested questions of law when
its jurisdiction is in doubt."  Do No Harm v. Pfizer Inc., 96
F.4th 106, 120-121 (2d Cir. 2024) (citation omitted).  Further,
"[a]s with any other matter on which the plaintiff bears the
burden of proof, each element of standing must be supported with
the manner and degree of evidence required at the successive
stages of the litigation."  Id. at 114 (citation omitted).

---

[2] Claim 11 is a request for declaratory judgment and is addressed
infra.

8

Where, as here, the defendants move to dismiss a complaint based on a "facial" challenge to the plaintiffs' standing (meaning that the defendants do not offer any evidence of their own), the court must "determine whether, accepting as true all material factual allegations of the complaint, and drawing all reasonable inferences in favor of the plaintiffs, the complaint alleges facts that affirmatively and plausibly suggest that the plaintiffs have standing to sue." New York v. Yellen, 15 F.4th 569, 575 (2d Cir. 2021) (citation omitted).  At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss" the court presumes "that general allegations embrace those specific facts that are necessary to support the claim." New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo, 80 F.4th 158, 180 (2d Cir. 2023) (citation omitted).  Finally, a plaintiff must demonstrate standing for each claim and form of relief sought.  TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021).

To establish standing, a plaintiff must show that

(1) they suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Do No Harm, 96 F.4th at 113 (citation omitted).  An injury is "concrete" if it is "real, and not abstract."  Soule v. Connecticut Assoc. of Schools, Inc., 90 F.4th 34, 45 (2d Cir. 2023) (citation omitted).  An injury is "actual or imminent" if it has actually happened or is "certainly impending."  Id. (citation omitted).

The "causal connection" element of standing, which is also described as "the requirement that the plaintiff's injury be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court, does not create an onerous standard."  Atares Bais Yaakov Academy of Rockland v. Town of Clarkstown, 88 F.4th 344, 352-353 (2d Cir. 2023) ("ABY Academy").  "It requires no more than de facto causality."  Id. at 353.  It does not require that the plaintiff plead facts to support an inference of proximate causation.  Id.

Finally, "[t]o satisfy the redressability element of Article III standing, a plaintiff must show that it is likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision."  Soule, 90 F.4th at 47 (citation omitted).  A plaintiff need not show that a favorable decision will relieve their every injury.  American Cruise Lines v. United States, 96 F.4th 283, 286 (2d Cir. 2024).  A remedy

"that would serve to eliminate any effects of the alleged violation that produced the injury is sufficient." Id. (citation omitted).

A.   Claim 1

The defendants contend that Claim 1 fails to allege an injury fairly traceable to ADL.  Claim 1 relates to Morgan State University's ("MSU") denial of Farrakhan's application to speak at its Fine Arts Center in 2023.  The SAC alleges, "[u]pon information and belief," that after MSU allowed Farrakhan to speak at the Fine Arts Center in 2014, ADL "either put pressure on the administration, or threatened to lobby against funding for Morgan State, if the administration allowed Minister Farrakhan to associate and peaceably assemble" with the University's students.  The SAC further alleges that ADL "used its power and authority derived from its close association with the federal government and caused Morgan State to reject the application" in 2023.  In support of that theory, Farrakhan points to the Ticketmaster Letter and a 1994 ADL report that stated in relevant part that "[w]hat [ADL] can and should do is impose an obligation on those who deal with [Farrakhan], or, in the case of universities, give him a platform."

The SAC alleges "[i]n the alternative" that MSU rejected the 2023 application "because of the relentless

misrepresentation of Minister Farrakhan by Defendant ADL as
being, among other things, 'antisemitic.'"  In other words, the
ADL's "years of falsely labeling Minister Farrakhan as 'anti-
Semitic' injured him in that it impaired his reputation to the
degree that it caused the administration of Morgan State to not
allow him to speak on its campus."

The SAC fails to plead that the plaintiffs' injury from
MSU's 2023 refusal of its forum is fairly traceable to the ADL.
Although the pleading standard for causation is not onerous, it
requires allegations that support a finding of de facto
causality.  The SAC's reliance on the ADL's years of advocacy
does not suffice to meet this standard.  If standing were found
to be present here, then the plaintiffs would have standing to
sue the ADL for virtually any refusal by a third party to
conduct business with the plaintiffs.

B.   Claim 2

The defendants assert that Claim 2 fails to allege a
concrete and actual injury.  Claim 2 alleges that by "actively
assisting" in the development of the Biden administration's
"U.S. National Strategy to Counter Antisemitism," which
President Biden signed on May 25, 2023, the ADL "as a federal
actor in concert with the federal government, has engaged in
actions that infringe[] upon Minister Farrakhan's First

Case: 24-1237, 07/30/2024, DktEntry: 40.1, Page 80 of 93

SPA-13

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 37 of 52
Case 1:23-cv-09110-DLC   Document 87   Filed 04/05/24   Page 13 of 25

Amendment right to free exercise of religion." The claim
alleges that the "National Strategy will, on one hand, provide
the legal justification to officially facilitate the continued
infringement upon the free exercise of Minister Farrakhan's
religion or, on the other hand, provide the legal justification
to facilitate the imminent arrest, prosecution, and likely
imprisonment of Minister Farrakhan."

Claim 2 fails to plead an injury in fact that is concrete
and particularized. Moreover, nothing in the voluminous SAC
comes close to demonstrating that the alleged threat of
prosecution of Farrakhan is "actual or imminent, as opposed to
conjectural or hypothetical." Do No Harm v. Pfizer, 96 F.4th at
113. It is noteworthy that the White House strategy document,
which is attached as an exhibit to the SAC, states that it "does
not purport to alter or preempt existing statutes, regulations,
policies, or the requirements of the Federal, state, or local
agencies that enforce them." Accordingly, the plaintiffs do not
have standing to claim that the ADL has violated its rights by
assisting the federal government in its development of the
National Strategy.

    C.    Claim 3

    The defendants contend that Claim 3 fails to allege an
injury fairly traceable to the ADL. Claim 3 alleges that Vimeo,

SPA-14

an online video streaming service, cancelled NOI's user account
due to violations of Vimeo's Terms of Service and Community
Guidelines, including Vimeo's policies against sharing videos
that are "hateful, harass others, or include defamatory or
discriminatory speech."  Vimeo's cancellation notice included a
hyperlink to an ADL article titled "Farrakhan Remains Most
Popular Antisemite in America."  Claim 3 alleges that ADL "used
its authority and sanctioning by the FBI to cause 'Vimeo' to
cancel" its account.  Claim 3 seeks monetary damages and an
injunction preventing ADL from "seeking to interfere with the
Nation of Islam's relationships with other social media
platforms by having said platforms cancel Nation of Islam
accounts."

While the plaintiffs have alleged an injury inflicted by a
third party that is concrete, they have failed to plead that
this injury is causally connected to ADL's advocacy.  While the
pleading of causation requires no more than allegations of de
facto causality, mere citation by a third party to ADL's general
advocacy is insufficient.  Any other finding would give the
plaintiffs standing to sue ADL whenever a third party injures
the plaintiffs and refers to the ADL's publications to justify
its decision.  The law of standing requires more linkage between
a defendant's activities and a plaintiff's injury.

14

D.   Claims 4 and 5

The ADL contends that Claims 4 and 5 must be dismissed because these claims do not plead an injury in fact or any causal link between its advocacy and any injury.  Claims 4 and 5 allege that the ADL acted under color of state law to violate NOI's free exercise and freedom of association rights.  The actions allegedly taken by ADL under color of state law are 1) transmitting data on hate and bias incidents to the New York State Division of Human Rights; 2) training the New York State Police in conducting hate crime investigations; and 3) serving as "the primary agent used by the State of New York to coordinate, implement, and oversee state departments and agencies in furtherance of their implementation of Defendant ADL's National Strategy to combat 'antisemitism.'"  At its core, the allegation is that because 1) the ADL's definition of antisemitism has been officially adopted by the State of New York; 2) the ADL transmits information on "hate and bias incident[s]" to state actors; and 3) New York City and State officials have indicated an intention to prosecute hate crimes, NOI and its members face possible law enforcement sanctions that create a chilling effect on their rights of free exercise and association and cause reputational harm.

Claim 4 alleges three injuries to NOI: reputational harm, the threat of sanctions by the City of New York, and a chilling effect on NOI's desire to hold national events in New York. Claim 5 alleges possible "disassociation" of members due to impairment of reputation, a chilling effect on association with non-members, and the chilling effect of being targets of ADL surveillance.

None of the alleged injuries are cognizable.  The threat of sanctions is, as with Claim 2, entirely speculative and thus not a sufficient basis for standing.  As for the alleged chilling effect on NOI's desire to hold national events in New York, "[s]uch 'some day' intentions -- without any description of concrete plans, or indeed even any specification of <u>when</u> the some day will be -- do not support a finding of the 'actual or imminent' injury" that standing requires.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 564 (1992).  Further, a

> chilling effect arising merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some <u>other</u> and additional action detrimental to that individual

is not "an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  <u>Clapper v. Amnesty Intern. USA</u>, 568 U.S. 398, 418 (2013) (citation omitted).

Case: 24-1237, 07/30/2024, DktEntry: 40.1, Page 84 of 93

SPA-17

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 41 of 52
Case 1:23-cv-09110-DLC   Document 87   Filed 04/05/24   Page 17 of 25

Moreover, the reputational harm alleged in this claim does not suffice for standing purposes.  The SAC alleges that ADL's "historical and contemporary actions of spying on and surveilling the Nation of Islam, coupled with its 'partner[ship] with the City of New York to guide its law enforcement departments in the apprehension and prosecution of people it determines [are] using 'hate,' serve[] to diminish the Nation of Islam's reputation in the community."  In other words, the alleged reputational harm will occur only if NOI or its members commit and are then prosecuted for hate crimes.  Because the injury alleged relies on speculative future actions by plaintiffs themselves along with New York State and City officials, it is not the "predictable effect" of ADL's own conduct.  ABY Academy, 88 F.4th at 352 (citation omitted).

Claims 4 and 5 also allege injuries as to NOI's members.  But "an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983," because the rights secured by § 1983 are "personal to those purportedly injured."  Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (citation omitted).

III. 12(b)(6)

The ADL defendants moved to dismiss claims 6, 7, 10, and 11 pursuant to Fed. R. Civ. P. 12(b)(6), arguing that plaintiffs have failed to state a claim.  The SWC defendants moved to

17

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 42 of 52
Case 1:23-cv-09110-DLC   Document 87   Filed 04/05/24   Page 18 of 25

dismiss the claims against them, claims 8 to 10, for the same reason.  Defendants are correct.  Plaintiffs have failed to state any claim upon which relief can be granted.

Under Rule 12(b)(6), a party "must plead enough facts to state a claim to relief that is plausible on its face." Green v. Dep't of Educ. of N.Y., 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Vengalattore v. Cornell Univ., 36 F.4th 87, 102 (2d Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accept[s] all factual allegations as true" and "draw[s] all reasonable inferences in favor of the plaintiffs." Melendez v. City of New York, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted).

A.   Defamation Claims

Farrakhan brings four claims for defamation based on eight challenged statements contained in four communications. Defendants argue that the challenged statements constitute non-actionable opinions and that Farrakhan has not pled actual malice.  They are correct.

18

Case: 24-1237, 07/30/2024, DktEntry: 40.1, Page 86 of 93

SPA-19

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 43 of 52
Case 1:23-cv-09110-DLC   Document 87   Filed 04/05/24   Page 19 of 25

The elements of a cause of action for defamation under New York law are

> 1) a written defamatory statement of fact concerning the plaintiffs; 2) publication to a third party; 3) fault (either negligence or actual malice depending on the status of the libeled party); 4) falsity of the defamatory statement; and 5) special damages or per se actionability (defamatory on its face).

Electra v. 59 Murray Enterprises, Inc., 987 F.3d 233, 259 (2d Cir. 2021) (citation omitted).[3]

Farrakhan does not dispute that he is a public figure.  As such, he must show that the statements were made with "'actual malice' -- that is, with knowledge that the statements were false or with reckless disregard as to their falsity."  Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015).  At the motion to dismiss stage, a plaintiff must "plead 'plausible grounds' to infer actual malice by alleging 'enough facts to raise a reasonable expectation that discovery will reveal evidence of' actual malice."  Id. at 546 (citation omitted).

Because falsity of the challenged statement is an element of the cause of action, "statements that do not purport to convey facts about the plaintiff, but rather express certain

---

[3] Defendants cite New York law in their briefing.  Plaintiffs do not dispute that New York law applies to this action.  "[W]here the parties agree that [New York] law controls, this is sufficient to establish choice of law."  Insurance Company o the State of Pennsylvania v. Equitas Insurance Limited, 68 F.4th 774, 779 n.2 (2d Cir. 2023).

kinds of opinions of the speaker, do not constitute defamation."

Elias v. Rolling Stone LLC, 872 F.3d 97, 110 (2d Cir. 2017)

(citation omitted) (emphasis in original).  In discerning

whether a statement is one of fact or opinion under New York

law, courts consider a non-exclusive list of factors that

includes

> (1) whether the specific language in issue has a
> precise meaning which is readily understood; (2)
> whether the statements are capable of being proven
> true or false; and (3) whether the full context of the
> communication in which the statement appears or the
> broader social context and surrounding circumstances
> are such as to signal to readers that what is being
> read or heard is likely to be opinion, not fact.

Id. (citation omitted).

Even where a challenged statement contains an opinion,

there is an "important distinction between a statement of

opinion that implies a basis in facts which are not disclosed to

the reader or listener and a statement of opinion that is

accompanied by a recitation of the facts on which it is based or

one that does not imply the existence of undisclosed underlying

facts."  Id. at 110-111 (citation omitted).  Thus, although an

"expression of pure opinion is not actionable, a statement of

opinion that implies that it is based upon facts which justify

the opinion but are unknown to those reading or hearing it, is a

'mixed opinion' and is actionable."  Stega v. New York Downtown

Hospital, 31 N.Y.3d 661, 674 (2018) (citation omitted).

SPA-21

 

1.   Non-Actionable Opinion

The challenged statements referring to Farrakhan as antisemitic are non-actionable statements of opinion.  The communications in which they were published contain "a recitation of the facts on which [they are] based" -- namely, direct quotes from Farrakhan.  See Elias, 872 F.3d at 110-111 (citation omitted).  Thus, the statements calling Farrakhan antisemitic cannot be "reasonably understood as implying the assertion of undisclosed facts justifying the opinion."  Celle v. Filipino Reporter Enterprises, Inc., 209 F.3d 163, 178 (2d Cir. 2000) (citation omitted).

The challenged ADL blog post title ("Farrakhan Predicts Another Holocaust") appears at first blush to be a statement "capable of being proven true or false," Elias, 872 F.3d at 110 (citation omitted), but "the full context of the communication in which the statement appears [and] the broader social context and surrounding circumstances are such as to signal" to readers that what is being read "is likely to be opinion, not fact." Id. (citation omitted).  The full title of the post, and its lede, indicate that its subject is the Savior's Day speech.  The post contains direct quotes from that speech, including one that could be fairly interpreted as a reference to the Holocaust. The full context of the communication indicates that its title

is an interpretation of the facts disclosed within the article. See id. at 111. The same is true for the statement in the SWC article that Farrakhan "invoked the New Testament's 'Synagogue of Satan' to demonize Judaism."

    2.    Statements of Fact

The portion of the Ticketmaster Letter that implies Farrakhan has referred to "Jews as 'termites' and 'satanic'" does have "a precise meaning which is readily understood." Elias, 872 F.3d at 110 (citation omitted). It is either true or false that Farrakhan has said so. For these statements, however, Farrakhan has not alleged facts allowing a reasonable inference of either falsity or actual malice.

As to the implication that Farrakhan has referred to Jews as satanic, the Ticketmaster Letter ends with the hyperlinked statement that "[y]ou can learn more about Louis Farrakhan and the Nation of Islam on our website." The words "Louis Farrakhan" are hyperlinked; clicking the link leads to a webpage on which further direct quotes from Farrakhan are listed and which is itself attached as an exhibit to the SAC. Several of those direct quote include Farrakhan's use of the phrase "satanic Jews." Thus, as to this challenged statement, Farrakhan has failed to allege falsity, an essential element of a defamation claim.

22

Finally, the SAC has not pled a defamation claim regarding Farrakhan's use of the word termites.  As the SAC concedes, Farrakhan has stated the following: "When they talk about Farrakhan, call me a hater, you know how they do -- call me an anti-Semite.  Stop it, I'm anti-termite!"  Again, Farrakhan has not pled facts that would "raise a reasonable expectation that discovery will reveal evidence" that Greenblatt or the ADL made the statement with knowledge of or reckless disregard as to the statement's falsity.  Biro, 807 F.3d at 546 (citation omitted).  To the contrary, the SAC itself alleges facts that would dispel any such expectation.

Thus, Farrakhan has not stated a defamation claim as to any of the challenged statements.  The defamation claims are dismissed pursuant to Rule 12(b)(6).

IV.  Declaratory and Injunctive Relief

The claims for declaratory and injunctive relief fare no better.  Claim 11 seeks a declaratory judgment that the ADL is a "quasi-governmental entity of the federal government."  Claim 10 seeks a declaratory judgment that the term "antisemite" and its variations are defamatory per se.  Plaintiffs also seek an injunction precluding defendants from calling plaintiffs antisemites.

District courts have "broad discretion to decline jurisdiction" under the Declaratory Judgment Act ("DJA").

Case: 24-1237, 07/30/2024, DktEntry: 40.1, Page 91 of 93

SPA-24

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 48 of 52
Case 1:23-cv-09110-DLC   Document 87   Filed 04/05/24   Page 24 of 25

Admiral Insurance Company v. Niagara Transformer Corporation, 57
F.4th 85, 100 (2d Cir. 2023) (citation omitted); see 28 U.S.C. §
2201(a).  This is so "even in circumstances when a declaratory
judgment would serve a useful purpose in clarifying and setting
the legal relations in issue or terminate and afford relief from
the uncertainty, insecurity, and controversy giving rise to the
proceeding."  Id. at 99 (citation omitted).

Here, the requested declaratory judgments would not serve a
useful purpose.  The plaintiffs lack standing on each claim that
relies on the theory that the ADL is a federal actor, and
plaintiffs have not stated a claim for defamation regarding any
of the challenged statements.  As such, a declaratory judgment
would not clarify any of the legal relations in issue.  The
Court therefore declines to exercise jurisdiction over claims 10
and 11.

Finally, enjoining defendants from expressing their beliefs
regarding plaintiffs would amount to a "judicial order that
suppresses speech . . . on the basis of the speech's content and
in advance of its actual expression" -- in other words, a prior
restraint on speech.  United States v. Farooq, 58 F.4th 687, 695
(2d Cir. 2023).  There is a "heavy presumption against the
constitutional validity of any imposition of a prior restraint."
Id. (citation omitted).  Prior restraints constitute "the most

24

Case: 24-1237, 07/30/2024, DktEntry: 40.1, Page 92 of 93

SPA-25

Case: 24-1237, 05/17/2024, DktEntry: 24.1, Page 49 of 52
Case 1:23-cv-09110-DLC  Document 87  Filed 04/05/24  Page 25 of 25

serious and the least tolerable infringement" on our freedoms of speech.  Citizens United v. Schneiderman, 882 F.3d 374, 386 (2d Cir. 2018) (citation omitted).  Nothing in the SAC comes close to meeting the "unequalled power of the presumption against prior restraint."  Id. at 387.

### Conclusion

The January 19, 2024 motions to dismiss are granted.  The SAC is dismissed in its entirety.

Dated:    New York, New York
          April 5, 2024

                                    _____
                                    DENISE COTE
                        United States District Judge

SPA-26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
FARRAKHAN et al.,

                                    Plaintiffs,

                        -against-                                        23 **CIVIL** 9110 (DLC)

                                                                        **JUDGMENT**

ANTI-DEFAMATION LEAGUE, et al.,

                                    Defendants.
-------------------------------------------------------------------X


          It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated April 5, 2024, the motions to dismiss filed on

January 19, 2024 are granted. The SAC is dismissed in its entirety.

**Dated:** New York, New York

          April 5, 2024

                                                        **RUBY J. KRAJICK**
                                                        _____
                                                        **Clerk of Court**

                                    BY:        *K. mango*
                                                        _____
                                                        **Deputy Clerk**